**University Hospital**
**v.**
**State Emp. Rel. Bd.**
*[Cite as 7 AOA 30]*

*Case No. C-890225*
*Hamilton County, (1st)*
*Decided October 3, 1990*

*Gregory B. Scott, Squire, Sanders & Dempsey, BancOhio, National Plaza, 155 East Broad Street, Columbus, Ohio 43215, and John F. Lewis, and George S. Crisci, 1800 Huntington Building, Cleveland, Ohio 44115, for Respondent-Appellant/ Appellee.*

*Anthony J. Celebrezze, Jr., Attorney General, and Joseph M. Oser, 30 East Broad Street, Columbus, Ohio 43266, for Complainant-Appellee/Appellant.*

*Susan J. Hauck, Tobias & Kraus, Suite 911, 484 Walnut Street, Cincinnati, Ohio 45202, for Intervenor-Appellee/ Appellant.*

HILDEBRANDT, J.

The complainant-appellee/appellant, State Employment Relations Board ("SERB"), and the intervenor-appellee/appellant, House Staff Association of the University of Cincinnati Medical Center (the "Association"), hereafter collectively referred to as the appellants, appeal from the judgment entered by the Hamilton County Court of Common Pleas in favor of the respondent-appellant/ appellee, University Hospital, University of Cincinnati College of Medicine ("University").[1] For the reasons that follow, we affirm the trial court's judgment.

The record discloses that the house staff at the University of Cincinnati Medical Center consists of 550 to 600 individuals who are graduate medical students pursuing residency training in specialty.[2] Approximately their respective fields of medical fifty of these residents are classified as clinical fellows ("fel-

lows"). A fellow has completed the residency in his chosen specialty and is eligible to take the National Medical Board examination in that field. However, the fellow has opted to take additional training in a subspecialty for which there are also board-certification examinations.

The duties of the house staff at University Hospital vary according to the individual's area of study as well as his seniority. The more senior house-staff members are responsible for direct patient care. However, the house staff remain under the supervision of the University's medical college faculty. A house-staff member's duties include prescribing medication and diet, delivering hands-on patient care, and discharging patients when appropriate.

House-staff members work approximately eighty hours a week. Senior residents are also charged with the supervision and teaching of medical school students and junior residents. Any employee expense chargeable to University Hospital, including those for nurses and residents, is reimbursed to University Hospital under Medicare Part A. Accordingly, the University is reimbursed for the time residents spend in direct patient care. This care includes medical procedures performed by residents who are not directly supervised by the medical school faculty. Such procedures include, for example, the insertion of a temporary pacemaker.

House-staff members receive a stipend from the University from which federal, state and local taxes are withheld. They do not participate in the University's pension plan. In addition to their stipend from the University, the house-staff members receive benefits including medical-malpractice insurance, individual and family medical insurance coverage, four weeks' paid vacation, free uniform and laundry service and paid education and examination leave.

Members of the house staff do not register with the University registrar, and they do not pay tuition. While they do not receive grades, their performance and progress during residency are evaluated by the University's medical school faculty. And although there is evidence in the record that residents provide substantial patient care, the ultimate responsibility for such care lies with the patient's attending physician (the "attending"). The University's residency program must be approved by the Accreditation Counsel for Graduate Medical Education ("ACGME") and the Residency Review Committee ("RRC"). To maintain this accreditation, the University must provide its residents with the Essentials of Accredited Residencies in Graduate Medical Education (the "Essentials"). The Essentials are requirements for medical education that must be completed by residents desiring to sit for the medical-board specialty examinations.[3]

In 1972, a committee[4] was formed to improve relations between the hospital[5] and the medical college. While this committee did not wish for the house staff to formally organize, the decision was made to deal with representatives of the house staff in order to redress certain complaints[6] of the house staff at that time.

The University and the Association reached an agreement that was reduced to writing in 1974. The University deemed this accord with the Association an "agreement" rather than a contract. The hospital was not a party to this process. The 1975 agreement provided that either party could terminate it upon notice to the other party. The agreement did not contain, however, an express recognition of the Association as a representative of the house staff, or a recognition of the house staff as a bargaining unit.

The record discloses that subsequent written agreements between the University and the Association were consummated from 1974 to July 1, 1983. The last such agreement became effective July 1, 1983, for the period ending June 30, 1985. On April 15, 1985, the Association notified the University of its desire to renegotiate the July 1, 1983, agreement. On April 18, 1985, the University notified the Association that it would not renew the agreement. This action generated the Association's unfair-labor-practice charge against the University, filed on May 20, 1986. Following a determination by SERB that probable cause existed to believe that the University had committed an unfair labor practice, a complaint was issued and the matter was set for a hearing before a SERB hearing examiner.

Following hearings during the summer of 1986, the examiner issued his findings of fact, conclusions of law and recommendations in which he determined, inter alia:

"1. The University Hospital, the University of Cincinnati, College of Medicine is a 'public employer' as defined in O.R.C. Section 4117.01(B).

"2. The House Staff Association of University of Cincinnati Medical Center is a 'employee organization' as defined in O.R.C. Section 4117.01(D).

"3. The residents and clinical fellows in the [Association's] bargaining unit are 'public employees' as defined by O.R.C. Section 4117.01(C).

"4. The residents and clinical fellows in the [Association's] bargaining unit are not 'Students' as defined by O.R.C. Section 4117.01(C) (11).

"5. The residents and clinical fellows of the [Association's] bargaining unit are Professional Employees' as defined by O.R.C. Section 4117.01(I).

"6. The residents and clinical fellows in the [Association's) bargaining unit constitute a 'deemed certified' bargaining unit pursuant to uncodified section 4(A) of Chapter 4117 of the Ohio Revised Code [sic].

"7. The University Hospital, the University of Cincinnati, College of Medicine, by and through its refusal to bargain collectively with a house staff association of University of Cincinnati Medical Center on behalf of the residents and clinical fellows has violated O.R.C. Sections 4117.11(A)(1) and (5)." T.d. 1, Appendix B.

The examiner's findings of fact and conclusions of law, "but not necessarily the analysis and discussion," were adopted by SERB on March 19, 1987, which ordered the University to:

"(a) CEASE AND DESIST FROM:

"(1) Interferring with, restraining, or coercing *a* employees in the exercise of their rights guaranteed in Chapter 4117 of the Ohio Revised Code, and

"(2) Refusing to bargain collectively with the representative of employees recognized as the exclusive representative or certified pursuant to Chapter 4117 of the Ohio Revised Code.

"(b) AND TAKE THE FOLLOWING AFFIRMATIVE ACTION:

"(1) Post for sixty (60) days in all University of Cincinnati Hospital buildings where the affected employees work the Notice to Employees furnished by the Board stating that the University of Cincinnati Hospital shall cease and desist from the action set forth in paragraph (a) and shall take the following affirmative action set forth in paragraph (b).

"(2) Immediately engage in collective bargaining pursuant to O.R.C. 4117.08, with any

bargain reached being retroactive to April 18, 1985." T.d. 1, Appendix A.

The University appealed SERB's order to the court below pursuant to R.C. 4117.13(D). On March 9, 1989, the court entered the following ruling:

"Upon consideration of the briefs, arguments and the record it is the conclusion of the court that R.C. Sec. 4117.01(C)(11) specifically excludes interns and residents from the definition of 'public employee' and the members of the house staff association are primarily fulfilling graduate educational requirements. The court therefore finds that the order of the state employment relations board is not supported by reliable, probative and substantial evidence and is therefore unreasonable and contrary to law.

"It is further ORDERED, ADJUDGED and DECREED that the order of the state employment relations board is REVERSED and the state employment relations board's cross-petition for enforcement is DENIED.

"*** "

T.d. 17.

From that judgment, the appellants bring this timely appeal.

The assignments of error asserted by SERB are stated as follows:

"1. THE LOWER COURT ERRED TO THE PREJUDICE OF APPELLEE-APPELLANT BY NOT FINDING THAT THE APPELLANT-APPELLEE WAS OBLIGATED TO BARGAIN WITH THE HOUSE STAFF ASSOCIATION BY OPERATION OF AM. SUB. S.B. 133 (140 OHIO LAWS, PART I, 336-371) SECTION 4(A).

"2. THE LOWER COURT ERRED TO THE PREJUDICE OF APPELLEE-APPELLANT BY FINDING THAT THE HOUSE STAFF ARE "STUDENTS" AS DEFINED BY R.C. 4117.01(C) (11).

Association asserts the following four assignments of error:

"1. THE COURT OF COMMON PLEAS ERRED IN APPLYING AN ERRONEOUS STANDARD OF REVIEW.

"2. THE COURT ERRED BY FAILING TO RECOGNIZE THE HOUSE STAFF ASSOCIATION AS A CERTIFIED BARGAINING UNIT UNDER SENATE BILL, 133 Sec. 4A.

"3. THE COURT ERRED IN OVERTURNING FACTUAL FINDINGS OF SERB WHICH WERE SUPPORTED BY SUBSTANTIAL EVIDENCE.

"4. THE COURT ERRED BY DISREGARDING SERB'S INTERPRETATION OF THE ACT'S DEFINITIONS."

None of the assignments of error[7] comply with Loc. R. 6(C)(3)(a), which provides that "[t]he statement of the assignments of error is not complete *** without citation to that portion of the record before the court on appeal wherein the lower court committed the error complained of *** ." See, also, *North Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App. 3d 342, 476 N.E. 2d 388. On the state of this record, however, where the proceedings below were finally and wholly concluded by the single ruling of the trial court entered March 9, 1989, without separate findings of fact and conclusions of law, we may infer that it is the March 9, 1989, ruling to which the assignments of error refer. Because the assignments of error are actually addressed to a single allegedly erroneous order of the trial court, and because the separate assignments of error involve interdependent issues of law and questions of fact, we consider the six assignments of error to present a single claim: that the trial court erred to the prejudice of SERB and the Association when, by its order entered March 9, 1989, it reversed SERB's previous order.

A trial court's review of an order of an administrative agency such as SERB is limited by R.C. 4117.13(D), which provides that " *** [t]he findings of the board as to the facts, if supported by substantial evidence on the record as a whole, are conclusive." See, also, *Lorain City Board of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St. 3d 257, 533 N.E.2d 264; *State Emp. Relations Bd. v. Bedford Hts.* (1987), 41 Ohio App. 3d 21, 534 N.E.2d 115. A trial court must also accord due deference to SERB's interpretation of the statutes that SERB has been delegated the responsibility to implement. *Lorain, supra; Bedford Hts., supra.* Although these standards of review apply to a trial court's review of a SERB order, "an appellate court's role is more limited than that of a trial court in reviewing the same order." *Lorain, supra* at 260-61, 533 N.E.2d at 267. With respect to factual questions, an appellate court is to determine only if the trial court has abused

its discretion, which implies "not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency." *Id.* at 261, 533 N.E. 2d at 267. With respect to questions of law involving statutes to be implemented by SERB, however, the standard of appellate review is the same "due deference" standard to be applied by the trial court. *Id.* at paragraph two of the syllabus.

In this case, the Association argues that the trial court failed to give due deference to SERB's interpretation of a "grandfather" clause of the Public Employees Collective Bargaining Act, Section 4(A) of S.B. 133 (140 Ohio Laws, Part I, 336, 367), which specifically confers "certified" status upon a bargaining unit that has achieved the requisite recognition from a public employer. Section 4 of the Act provides, in part, as follows:

"(A) Exclusive recognition through a written contract, agreement, or memorandum of understanding by a public employer to an employee organization whether specifically stated or through tradition, custom, practice, election, or negotiation the employee organization has been the only employee organization representing all employees in the unit is protected subject to the time restriction in division (B) of section 4117.05 of the Revised Code. Notwithstanding any other provision of *a* this act, an employee organization recognized as the exclusive representative shall be deemed certified until challenged by another employee organization under the provisions of this act and the State Employment Relations Board has certified an exclusive representative."

As noted above, the SERB hearing examiner determined that the Association was an "employee organization" as defined in R.C. 4117.01(C), and that the residents and clinical fellows in the Association's bargaining unit constituted a "deemed certified" bargaining unit under Section 4(A) of the Act. The examiner also expressly found the residents and interns to be "public employees" as defined by R.C. 4117.01(C), a finding that was directly contradicted by the trial court's March 9, 1989, order.

Although the SERB hearing examiner did not address the issue in detail in his findings of fact and conclusions of law, the trial court reached a different conclusion concerning the house staff's status as public employees on the ground that R.C. 4117.01(C) (11) "specifically excludes interns and residents from the definition of 'public employee' and the members of

the house staff association are primarily fulfilling graduate educational requirements." T.d. 17.

To the extent that the trial court's order involved a determination of questions of fact, we cannot say that it amounted to an abuse of discretion. It is possible that the finding of the SERB hearing officer adopted by SERB could have been found by the trial court to be supported by substantial evidence on the record as a whole, including the facts that house-staff members are charged with responsibility for direct patient care, perform substantial patient-care services and receive a taxable stipend and other benefits. Because, however, there is also substantial conflicting evidence within the record that the house staff's primary purpose at the hospital is to obtain educational training, including evidence that the experience acquired by house staff is an indispensable element of achieving either specialty or subspeciality certification, we cannot say that the trial court's order was the result of perversity of will, passion, prejudice, partiality or moral delinquency.

To the extent that the trial court's order involved questions of interpretation of R.C. Chapter 4117 and the grandfather clause, we hold that the trial court accorded due deference to the interpretations made by SERB, even though it apparently found them to be erroneously applied to the facts before it.

The determination of whether the Association can take advantage of Section 4(A) of the Act depends, in turn, upon whether the Association is an "employee organization" under the Act. An employee organization is defined by R.C. 4117.01(D) as "any labor or bona fide organization in which public employees participate and which exists for the purpose, in whole or in part, of dealing with public employers concerning grievances, labor disputes, wages, hours, term and other conditions of employment." "Public employees" are defined by R.C. 4117.01(C)(11) as, generally, any person working for a public employer except, among others, "[s]tudents whose primary purpose is educational training, including graduate assistants or associates, residents, interns, or other students working as part-time public employees less than fifty per cent of the normal year of the employee's bargaining *a* unit *** ." In other words, if house staff are deemed to be students under R.C. 4117.01(C) (11), then the Association cannot be considered an employee organization under R.C. 4117.01(D), and is not entitled to invoke any entitlements it might otherwise claim under Section 4(A) of the grandfather clause.

Before going further, however, we must determine whether the definitions provided in R.C. Chapter 4117 apply to the text of the grandfather clause. The Association argues that this court, in *Univ. of Cincinnati, Univ. Hosp. v. State Emp. Relations Bd.* (1988), 42 Ohio App. 3d 78, 536 N.E.2d 408, determined that the second sentence contained in Section 4(A) excludes the application of the definitional section, R.C. 4117.01, to the grandfather clause. The sentence emphasized in *Univ. of Cincinnati, supra*, states:

"Notwithstanding any other provision of this act, an employee organization recognized as the exclusive representative shall be deemed certified until challenged by another employee organization under the provisions of this act and [SERB] who certified an exclusive representative."

In *Univ. of Cincinnati*, we were asked to determine whether a public employer is obligated by Section 4(A) to bargain with a previously recognized bargaining unit containing workers who may have been excluded from the Act's definition of "public employees" because the bargaining unit contained, among others, management-level employees and supervisors who are excluded from the statutorily defined meaning of "public employees" under R.C. 4117.01(C) (7), (10). That precise issue was not reached in our decision, however, because it was apparent that the contested bargaining unit contained employees who nevertheless did qualify as "public employees" under R.C. 4117.01, and we found the emphasized language of Section 4(A) of the Act to indicate that "the legislature intended that those bargaining units in existence on October 6, 1983, *would remain intact."* *Id.* at 81, 536 N.E.2d at 411. (Emphasis added.)

The assertion that SERB, in its order adopting its hearing officer's findings of fact and conclusions of law, interpreted the grandfather clause to exclude application of R.C. 4117.01's definitional section to the uncodified portion of the act, is not well taken. SERB's March 19, 1987, order expressly found the House Staff to be "'public employees' as defined by O.R.C. Section 4117.01(C)(11)," the University to be a "public employer" and the Association to be an "employee organization" under the statute. T.d. 1, Appendix B. If, as it now argued, SERB determined that the definitional section

had no bearing on whether employees may be entitled to invoke the grandfather clause's protection, its findings would be rendered mere surplusage. SERB apparently and reasonably believed that the use of the term "employee organization" in the sentence excluding application of the other provisions of the Act indicates that an organization must first qualify as a statutorily defined "employee organization" before it is entitled to invoke the grandfather clause's advantages.

The trial court's order, which also makes reference to the house staff's classification as "public employees" under R.C. 4117.0l(C)(11), also indicates that it deferred to SERB's implicit legal interpretation that R.C. 4117.01 applied to the grandfather clause. It is a determination to which we also now defer.

Under the Act, the preliminary determination of whether the house staff are "students whose primary purpose is educational training *** " is inevitably a question of fact. Cf. *Bostic v. Connor* (1988), 37 Ohio St. 3d 144, 524 N.E.2d 881, paragraph one of the syllabus ("Whether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact"). Although we note that it is unclear whether the portion of the succeeding phrase of R.C. 4117.01(C)(11) referring to part-time students modifies only the immediately preceding terms "other students" or whether it also modifies "graduate assistants or associates, residents, [or] interns," the ambiguity does not create a question of law as to the correct interpretation of 4117.01(C). The ambiguity occurs in the portion of the statute that merely elucidates the meaning of the antecedent phrase "students whose primary purpose is educational training." The determination of whether the house staff are students whose primary purpose is educational training remains a question of fact, to which we apply an abuse-of-discretion standard of review. We have carefully reviewed the record before us and, as we have noted above, we find no such abuse of discretion to have occurred.

We, therefore, find the assignments of error, as discussed above, not to be well taken and, accordingly, affirm the judgment of the trial court.

DOAN, J., concurs.

UTZ, P.J., dissents.

I must respectfully dissent from the majority opinion. I am convinced that the board's decision should have remained intact upon review in the court of common pleas.

Based upon legal interpretations that were owed due deference, and upon factual determinations that the majority concedes are firmly rooted in the evidence, SERB concluded in the case *sub judice* that the house-staff members were 'public employees who were entitled to the protection of the Public Employees Collective Bargaining Act. Notwithstanding this, the majority now holds, using an abuse-of-discretion standard of review, that the decision to overturn SERB's order in the court of common pleas must remain undisturbed because it turned on evidence that supported a differing factual assessment of the status of house-staff members as public employees. In reaching this result on appeal, the majority, by implication, is permitting a common pleas court to substitute its judgment for that of SERB in any case where the evidentiary record developed at the agency level gives rise to disputed questions of material fact. Such sweeping judicial review on the part of a common pleas court is, however, in plain violation of the legislative mandate contained in R.C. 4117.13(D), which unambiguously provides that "findings of the board as to the facts, if supported by substantial evidence on the record as a whole, are conclusive."

Because the legislative mandate is clear, and because its application to the evidentiary record in this case provides ample justification for upholding SERB's order, I am firmly convinced that the common pleas court's abdication of its proper role in the process of judicial review was so extreme that it amounted to an abuse of discretion. To hold otherwise would, in my judgment, emasculate the importance of SERB's adjudicatory functions and leave the court of common pleas as the only meaningful arbiter of disputed factual issues. This is not what the legislature intended, and so I must respectfully dissent.

---

[1] Each appellant filed a separate notice of appeal. Those appeals have been consolidated by this court for purposes of briefing, argument and opinion.

[2] Testimony on behalf of the Association and SERB was presented through Dan N. Hagler, M.D. It was stipulated before the SERB hearing examiner that Dr. Hagler's testimony was representative of other house staff members who would have been called to testify. Approximately

ninety-five percent of the house staff of the University Medical Center are members of the Association.

[3] This requirement became effective July 1, 1982. ACGME and RRC are in the process of preparing similar written guidelines for clinical fellowships. Should the University fail to provide Essentials to its residents, it would either be placed upon probation or lose its accreditation. A person may not sit for the medical board examination in his field of specialty without completing an accredited residency.

[4] The committee consisted of a University representative, a representative of the University of Cincinnati Board of Governors, the Vice President of the University for Medical Center Affairs, the Dean of the College of Medicine, and each director of the medical and surgical departments.

[5] At that time, the University Hospital was operated as General Hospital.

[6] Matters of contention at that time included salary and the house staff's ability to work outside of the University when not on duty. This relationship between the University and the house staff became a subject for -review for the Joint Commission for Accreditation of Hospitals ("JCAH")

[7] The University has attempted to interject, by way of its response to SERB's and the Association's assignments of error, an additional assignment of error that "SERB's Retroactive Bargaining Order Has No Basis In Law." Brief of Appellee at 31. This "assignment" addresses an issue not within the scope of either SERB's or the Association's assignments of error and cannot be considered as an additional assignment of error made to prevent a reversal of judgment in its favor under R.C. 2505.22. Because the assignment of error has not been raised by a separately filed cross-appeal, we do not address it on appeal. See *Sheppard v. Hack* (1980), 68 Ohio App. 2d 95, 427 N.E.2d 522.